**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN CHERRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **CIVIL ACTION** |
| **v.** | ) | **NO.  07-cv-2235** |
| | ) | |
| **SUNOCO, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

**MEMORANDUM OPINION AND ORDER**

**RUFE, J.**                                                                                    **August 17, 2009**

Plaintiff John Cherry brings this action against Defendant Sunoco, Inc. alleging that Defendant engaged in religious discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"),[1] and the Pennsylvania Human Relations Act ("PHRA"),[2] when it terminated Plaintiff for refusing to pose for a photograph to be used in a photographic identification credential ("photo ID").  Before the Court are Defendant's Motion for Summary Judgment,[3] Plaintiff's Response[4] and Defendant's Reply.[5]  For the reasons that follow, the Court will grant Defendant's Motion.

I.      **FACTUAL AND PROCEDURAL BACKGROUND**

_____

[1] 42 U.S.C. § 2000e, et seq.

[2] 43 Pa. Stat. §§ 951-963.

[3] Mot. for Summ. J. of Def. Sunoco. Inc. [Document No. 29] ("Def.'s Mot.").

[4] Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. [Document No. 34] ("Pl.'s Resp."); see also Ex. B [Document No. 35] and Ex. C [Document No. 36].

[5] Reply Br. in Further Support of Def.'s Mot. for Summ. J. [Document No. 37] ("Def.'s Reply").

On or about March 26, 2001, Defendant hired Plaintiff as a refinery operator at its Philadelphia refinery.[6]  Defendant's Philadelphia refinery is a large oil refining facility located on the banks of the Schuylkill River.[7]  It is a massive facility that resides on approximately one thousand acres of land and employs over 1,500 employees.[8]  As a refinery operator at the Philadelphia facility, Plaintiff was a member of the Paper, Allied-Industrial, Chemical and Energy Workers International Union ("Union").[9]

When Plaintiff was hired, Defendant had a policy in place that required its employees to have photo ID.[10]  Plaintiff was granted an exception to this rule because of his religious beliefs.[11]  Specifically, Plaintiff is a member of the Church of the True and Living God, a sect of Hebrew

---

[6] Compl. [Document No. 1] ¶¶ 4, 9.

[7] Def.'s Reply Ex. B (Arbitration Tr., December 19, 2005 ("Arb. Tr.")) at 19:6-7.  Plaintiff opposes the Court giving any deference to the findings of the Arbitrator, rendered after the December 19, 2005 arbitration hearing, or to the findings of the PHRC.  (Pl.'s Resp. at 7.)  Plaintiff argues that these findings are hearsay statements which would not be admissible at trial.  (Id.)  The Court need not consider this argument as it will not rely on nor give any deference to these findings in resolving the instant Motion.

The Court, however, will address this argument as it applies to the transcribed testimony from the December 19, 2005 arbitration hearing in this matter, even though Plaintiff does not oppose the Court's consideration of the same.  The Court will consider this sworn testimony for purposes of the instant Motion as it is the equivalent of an affidavit for purposes of Federal Rule of Civil Procedure 56(e).  Small v. Frank, 1996 WL 426539, at *4 (E.D. Pa. July 29, 1996) (citation omitted).  The testimony relates to the witness's "personal knowledge, set[s] out facts that would be admissible in evidence, and show[s] that the [witness] is competent to testify on the matters stated."  FED. R. CIV. P. 56(e)(1).  Moreover, unlike the cases cited by Plaintiff, the subject matter of the testimony is not hearsay, and would be admissible at trial.  See Shelton Univ. of Med. & Dentistry, 223 F.3d 220, 223 n.2 (3d Cir. 2000) (relating to a letter from an employer memorializing a discussion between the employee and her manager); Stelwagon Mfg. Co. v. Tarmac Roofing Sys., Inc., 63 F.3d 1267, 1275 n.17 (3d Cir. 1995) (relating to testimony by employees about out-of-court conversations with customers).  Thus, the Court will consider the testimony from the December 19, 2005 arbitration hearing for the purposes of the instant Motion.

[8] Arb. Tr. at 19:3-11.

[9] Def.'s Reply Ex. A (Deposition of John Cherry, September 4, 2008 ("Cherry Dep.")) at 64:5-14.

[10] Compl. ¶ 11.

[11] Id.

Israelites.[12]  Plaintiff believes that the Second Commandment prohibits him for posing for pictures or photographs, and from carrying the same upon his person.[13]  It is not against Plaintiff's religion to have a photograph taken of him without his consent, as long as he is not posing for it.[14]  Plaintiff has never willingly posed for a photograph.[15]  From 2001 up and until the events in question, Defendant provided Plaintiff with an employee ID without a photograph.[16]  Even after the events of September 11, 2001, Defendant still accommodated Plaintiff's refusal to pose for a photograph, but required him to report to security when he came into work to show his badge.[17]  Plaintiff's supervisor would sometimes verify Plaintiff's identify if the security guard on duty did not know Plaintiff.[18]

Of the many operating units at the Philadelphia refinery, Plaintiff worked in the catalyst cracking unit, which was responsible for heating and condensing crude oil.[19]  When Plaintiff arrived at work each day, he would first go through the security gate and swipe his employee ID to gain access to the refinery.[20]  After going through the security gate, Plaintiff would walk about two minutes to report to his work location, Building 868 or the "block house."[21]  Plaintiff worked a

---

[12] Id. ¶ 5.

[13] Id. ¶¶ 7-8, Cherry Dep. at 99:20-101:6, 130:5-12.

[14] Cherry Dep. at 101:7-102:12.

[15] Id. at 102:13-18.

[16] Id. at 91:18-92:10.

[17] Id. at 92:16-93:14.

[18] Id. at 93:15-19.

[19] Id. at 66:4-24, 71:13-72:7.

[20] Id. at 65:12-20, 78:23-79:9.

[21] Id. at 68:1-17.

twelve-hour shift, ten of which he spent in the block house.[22]  The remaining two hours he spent at other work locations inside the refinery.[23]

In 2002, Congress enacted the Maritime Transportation Safety Act ("MTSA").[24]  The United States Coast Guard then enacted regulations "to implement portions of the maritime security regime" as required by the MTSA ("Regulations").[25]  Defendant was required to be in compliance with the MTSA and these Regulations on or before June 30, 2004.[26]  Complying with the new Regulations, Defendant developed a Facility Safety Plan ("FSP"),[27] which required all employees at the Philadelphia refinery to carry photo IDs.[28]

Prior to the effective date of the FSP, William Capresecco, Defendant's Manager of Human Resources for the Philadelphia refinery, informed the president of Plaintiff's local Union that all employees would have to have photo ID and that it was required by law.[29]  On June 4, 2004, Mr. Capresecco also provided Plaintiff's Union representative with a copy of the "section of the MTSA

---

[22] Id. at 65:7-11, 85:1-10.

[23] Id. at 85:11-12.

[24] 46 U.S.C. § 70101 et seq.

[25] Def.'s Reply Ex. C at 318 (33 C.F.R. § 101.100(a)(1)).  The Regulations in effect at the time of the events in question have been attached as Exhibit C to Defendant's Reply.  The Court will rely on these in resolving the instant Motion.

[26] Def.'s Reply Ex. C at 354 (33 C.F.R. § 105.115(b)).

[27] Def.'s Reply Ex. C at 353, 355 (33 C.F.R. §§ 105.115(a), 105.200(b)(4)).

[28] Compl. ¶¶ 13, 14; Arb. Tr. at 47:16-49:3.  The Court notes that Defendant submitted a company policy stating that all employees "must display Facility photo [sic] Identification/Access Cards."  (Def.'s Reply Ex. E at 4.)  This is no indication, however, that this policy was in effect during the relevant time period, as the only dates noted are the revision date of November 17, 2004 and the next review date of November 17, 2005.  (Id. at 1.)  Hence, the Court did not consider this document for purposes of the instant Motion.

[29] Arb. Tr. at 48:17-49:6.

that the company used in developing its 'new' security guidelines."[30]  On or about August 10, 2004, Plaintiff was informed that because of the implementation of "some different laws," he would have to pose for a photograph for identification purposes.[31]  Plaintiff refused and as a result, a conference was scheduled for the following Friday.[32]

The following persons attended a meeting held on or about August 13, 2004:  Plaintiff; Gerry McBride, the superintendent of Plaintiff's unit;[33] Jim Savage, Plaintiff's Union represenative;[34] Mr. Capresecco;[35] and Megan Kuzinski, a human resources analyst.[36]  At the meeting, Plaintiff was again informed that Defendant was requiring a photo ID for all employees and that he must pose for a photograph in order to continue his employment with Defendant.[37]  Plaintiff continued to refuse, explaining that his religious belief dictated his refusal and submitting a corresponding letter from his church.[38]  Mr. Savage asked if Plaintiff could present his driver's license in conjunction with his current employee ID without a photo.[39]  It was reiterated that Plaintiff needed to have a photo ID as

---

[30] Def.'s Reply Ex. F.

[31] Cherry Dep. at 106:17-107:21, 109:12-111:8.

[32] Id. at 111:9-16; Def.'s Reply Ex. G.

[33] Cherry Dep. at 108:9-14, 112:19-20.

[34] Id. at 112:19-22.

[35] Id. at 112:24.

[36] Id. at 119:6-12; Ex. H.

[37] Cherry Dep. at 114:3-5.

[38] Id. at 114:6-12.

[39] Id. at 114:13-16; 119:21-120:3.

a result of a new law and/or regulations.[40]  According to Plaintiff, he then requested to see the law, but was told a copy was not on hand.[41]  In his deposition, Plaintiff also testified that during the meeting he suggested that his identification could be verified by his supervisor, as it had in the past.[42]

At the end of the meeting, Mr. Capresecco suspended Plaintiff without pay.[43]  In his deposition, Plaintiff testified that Mr. Savage objected to his suspension, as they were not shown any documents proving that a photograph was required and he himself did not know of and had not seen any such documents.[44]  During his deposition, Plaintiff stated several times that he was unaware of the MTSA and its Regulations until right before his arbitration hearing.[45]  By letter dated August 19, 2004, Plaintiff was terminated for his refusal to comply with employee identification requirements, effective as of the date of that letter.[46]  The Union filed a grievance upon Plaintiff's behalf, and it proceeded to arbitration.[47]  At some point prior to the arbitration of the grievance but after Plaintiff's termination, Mr. Savage did obtain a copy of the Regulations and provided the same to Plaintiff.[48]

---

[40] Id. at 114:16-17; 122:17-20.  In his deposition, Plaintiff states first that he was informed that the change was due to a new law, but later states that he was told that it was a result of new regulations.  This discrepancy is immaterial to the Court's analysis.

[41] Id. at 114:17-19.

[42] Id. at 119:13-19; 141:13-16.

[43] Id. at 114:22-24.

[44] Id. at 115:1-4.

[45] Id. at 122:15-16, 127:17-128:9, 139:12-141:1.

[46] Def.'s Reply Ex. H.

[47] Cherry Dep. at 121:23-122:4, 123:14-124:21.

[48] Id. at 134:1-8, 140:17-141:1.

During the arbitration hearing, Defendant called William Towers to testify.[49]  In the summer of 2004, Mr. Towers was the operations supervisor for the implementation and execution of the MTSA.[50]  As part of his job duties, Mr. Tower ensured that Defendant's facilities, including the Philadelphia refinery, were in compliance with the FSP and the MTSA.[51]  Mr. Towers testified that the Philadelphia refinery was covered by the MTSA as a port facility.[52]  Mr. Towers also testified that in July of 2004, he contacted the chief petty officer of the Coast Guard who was in charge of the Philadelphia refinery.[53]  He asked him if the photo ID requirement could be waived and was told that it could not be waived.[54]  According to Mr. Towers, the Philadelphia refinery was inspected or audited almost every day by the Coast Guard, the Department of Homeland Security or the border patrol with Customs.[55]  Mr. Towers testified that a photo ID would be necessary for the identification of an employee after entering the Philadelphia refinery due to the constant audits and inspections, as well as any additional security measures that may be required.[56]

With regard to accommodating his religious beliefs, Plaintiff stated in his response to Defendant's interrogatories that prior to his termination, in addition to suggesting a supervisor verify his identity and that he show his non-photo driver's license, he also suggested that he be escorted

---

[49] Arb. Tr. at 17:14.

[50] Id. at 18:14-19.

[51] Id. at 18:20-19:2.

[52] Id. at 19:19-21.

[53] Id. at 23:13-23, 24:1-5.

[54] Id. at 23:17-24.

[55] Id. at 25:1-17, 26:3-14.

[56] Id. at 44:5-16.

to his work location rather than proceeding unescorted.[57]   During the grievance process, Plaintiff claims he suggested his religious beliefs be accommodated using biometric identification, such as fingerprints or iris scan, which he offered to pay for at least in part.[58]   Finally, according to his response to Defendant's interrogatories, Plaintiff also offered to allow his photographic image to be captured by security cameras.[59]   Plaintiff admitted at his deposition that he has no direct knowledge of Defendant's security systems beyond the process of entering the Philadelphia refinery through the security gates.[60]   Defendant contends that Plaintiff requested no other accommodation beyond eliminating the photo identification requirement.[61]

After Plaintiff's grievance was denied by the arbitrator, Mr. Savage advised him to file a complaint with the Pennsylvania Human Resources Commission ("PHRC").[62]   As part of the PHRC's investigation into Plaintiff's complaint, further clarification on the Regulations was requested from the Coast Guard, specifically whether the requirement for a photo ID could be waived or any accommodation made.[63]   The Coast Guard responded in the negative, stating:

> There is no exception to these minimum standards, nor any allowance for accommodation.   Verifying a person's identity is a key component of our maritime security regulatory regime.   It is imperative that any form of personal identification presented allow for the accurate verification of the identity of the person presenting the piece of identification.   Without a

---

[57] Pl.'s Resp. Ex. B at 12.

[58] Id.; Cherry Dep. at 141:16-17; Compl. ¶ 18.

[59] Pl.'s Resp. Ex. B at 12.

[60] Cherry Dep. at 196:5-198:2.

[61] Pl.'s Resp. Ex. C.

[62] Cherry Dep. at 124:17-125:18, Def.'s Reply Ex. I.

[63] Def.'s Reply Ex. J.

photograph the identity of the presenter cannot be verified with sufficient certainty to meet this aspect of the regulation.[64]

Plaintiff's PHRC complaint was ultimately dismissed.[65]  Plaintiff then filed his Complaint with this Court on June 4, 2007.[66]  Defendant filed a motion to dismiss Plaintiff's Complaint,[67] which the Court denied.[68]  Defendant answered Plaintiff's Complaint on May 2, 2008.[69]  On December 17, 2008, Defendant moved for summary judgment on all of Plaintiff's claims.[70]  The Court has considered Defendant's Motion for Summary Judgment, Plaintiff's Response, the Reply and all accompanying materials, and this matter is now ready for disposition.

## II.  LEGAL STANDARD

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law."[71]  An issue of material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[72]  In examining these motions, all inferences must be drawn in the light most favorable to the nonmovants, and their allegations must be treated as true whenever they conflict with those of the

---

[64] Def.'s Reply Ex. K.

[65] Def.'s Reply Ex. M.

[66] Compl.

[67] Mot. to Dismiss the Compl. [Document No. 4].

[68] Order, April 14, 2009 [Document No. 12].

[69] Answer [Document No. 15].

[70] Def.'s Mot.

[71] FED. R. CIV. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

[72] Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

movants and are supported by proper proofs.[73]   The Court will not, however, make any credibility

determinations or weigh the evidence presented.[74]

      The party moving for summary judgment bears the initial burden of demonstrating that there

are no genuine issues of material fact.[75]   Once the movant has done so, the opposing party cannot rest

on its pleadings.[76]   To defeat summary judgment, the nonmovant must come forward with probative

evidence demonstrating the existence of genuine issues for trial.[77]   The nonmovant therefore must

raise "more than a mere existence of a scintilla of evidence in its favor" for elements on which it

bears the burden of production.[78]   An inference based upon speculation or conjecture will not create

a material fact.[79]

## III.   THE MTSA REGULATIONS REQUIRE PHOTOGRAPHIC IDENTIFICATION

      As explained *supra*, Congress enacted the MTSA in 2002,[80] and the Coast Guard then issued

Regulations to implement the same.[81]   Defendant's Philadelphia refinery, as a port facility, was

required to comply with both.[82]   Key to the Regulations is the definition of three different levels of

---

[73] <u>Kopec v. Tate</u>, 361 F.3d 772, 775 (3d Cir. 2004).

[74] <u>Goodman v. Pa. Tpk. Comm'n</u>, 293 F.3d 655, 665 (3d Cir. 2002) (quoting <u>Reeves v. Sanderson Plumbing Prods.</u>, 560 U.S. 133, 150 (2000)).

[75] FED. R. CIV. P. 56(c).

[76] <u>Celotex</u>, 477 U.S. at 324.

[77] <u>Id.</u> at 323-24.

[78] <u>Anderson</u>, 477 U.S. at 252.

[79] <u>Robertson v. Allied Signal, Inc.</u>, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

[80] 46 U.S.C. § 70101 <u>et seq.</u>

[81] Def.'s Reply Ex. C at 318 (33 C.F.R. § 101.100(a)(1)).

[82] Arb. Tr. at 19:12-21; <u>see also</u> Def.'s Reply Ex. D.

security measures that a port facility must maintain based upon the prevailing threat environment.[83] The lowest of these Maritime Security Levels, or "MARSEC Levels," is MARSEC Level 1.[84]  The security measures required by MARSEC Level 1 are considered the minimum and must be maintained at all times.[85]  MARSEC Levels 2 and 3 only add additional security measures to those required by MARSEC Level 1, without eliminating anything.[86]  Thus, any security measure required at MARSEC Level 1 must be in place at all times.

Each port facility is required to establish the "means of identification required to allow access to the facility and for individuals . . . to remain on the facility without challenge."[87]  Yet, the system established for checking the identity of facility employees or and other persons seeking access to the facility must also allow "identification of authorized and unauthorized persons at any MARSEC Level."[88]  At MARSEC Level 1, port facilities must "check the identification of any person seeking to enter the facility, including . . . facility employees."[89]  Moreover, a person must be denied access to or removed from the port facility if that person "is unable or unwilling, upon the request of facility

---

[83] See Def.'s Reply Ex. C at 353 (33 C.F.R. § 101.105 (defining "Maritime Security (MARSEC) Level" as "the level set to reflect the prevailing threat environment to the maritime elements of the national transportation system . . .")); see also Def.'s Reply Ex. C at 355, 358 (33 C.F.R. § 101.205 (corresponding MARSEC Levels with the Homeland Security Advisory System threat condition); 33 C.F.R. § 105.230(a)).

[84] See Def.'s Reply Ex. C at 321 (33 C.F.R. § 101.105 (*MARSEC Level 1, MARSEC Level 2, MARSEC Level 3*)).

[85] Def.'s Reply Ex. C at 321 (33 C.F.R. § 101.105 (*MARSEC Level 1*)).

[86] Def.'s Reply Ex. C at 360-61 (33 C.F.R. § 105.255(f), (g)).

[87] Def.'s Reply Ex. C at 359 (33 C.F.R. § 105.255(b)(3)).

[88] Def.'s Reply Ex. C at 359-60 (33 C.F.R. § 105.255(c)(1)).

[89] Def.'s Reply Ex. C at 360 (33 C.F.R. § 105.255(e)(3)).

personnel, to establish his or her identity . . . ."[90]  Crucial to the matter at hand, the Regulations

dictate that for the purposes of gaining access to a port facility, "[a]ny personal identification

credential accepted . . . must, at a minimum . . . (3) Contain a photo that accurately depicts that

individual's current facial appearance."[91]  Thus, the Regulations require that in order for persons,

including facility employees, to gain access to a port facility, they must have proof of identification

that includes a photograph of that person's face.

Noncompliance by a port facility with the Regulation could result in "(1) restrictions on

facility access; (2) conditions on facility operations; (3) suspension of facility operations; (4) lesser

administrative and corrective measures; or (5) suspension or revocation of security plan approval,

thereby making that facility ineligible to operate in, on, under or adjacent to waters subject to the

jurisdiction of the U.S. in accordance with 46 U.S.C. § 70103(c)(5)."[92]  Any person who does not

comply with the Regulations is "liable to the U.S. for a civil penalty of not more than $25,000 for

each violation."[93]

## IV.  PLAINTIFF'S TITLE VII CLAIM FOR RELIGIOUS DISCRIMINATION MUST FAIL

Defendant asserts that it is entitled to summary judgment on Plaintiff's Title VII claims

because Plaintiff cannot establish a *prima facie* case of religious discrimination.  Moreover,

Defendant contends that even if Plaintiff could demonstrate a *prima facie* case, it would still be

---

[90]  Def.'s Reply Ex. C at 360 (33 C.F.R. § 105.255(e)(4)).

[91]  Def.'s Reply Ex. C at 328 (33 C.F.R. § 101.515(a)(3)).

[92]  Def.'s Reply Ex. C at 327 (33 C.F.R. § 101.410(c)(1)-(5)).

[93]  Def.'s Reply Ex. C at 327 (33 C.F.R. § 101.415(b)).  The Court acknowledges that Defendant has also argued that criminal penalties could be imposed.  This, however, only applies if there is a violation of a Maritime Security Directive.  Def.'s Reply Ex. C at 327 (33 C.F.R. § 101.415(a)).  As Defendant has not argued that there is a Maritime Security Directive requiring facility employees to carry a photo ID, then the criminal penalties would not apply.

entitled to summary judgment as it could not accommodate Plaintiff without suffering undue hardship.  Plaintiff argues that he has set forth a *prima facie* case of religious discrimination. Moreover, Plaintiff maintains that Defendant could have accommodated his religious beliefs without undue hardship, and forwards several possible means by which Defendant could have done so.  The Court will address each of these arguments in turn.

A.    *Plaintiff cannot establish a prima facie case of religious discrimination*

In order to demonstrate a *prima facie* case of religious discrimination, an employee must show that he/she: (1)  holds a sincere religious belief that conflicts with a job requirement; (2) notified the employer of the conflict; and (3) was disciplined for failing to comply with the conflicting requirement.[94]  Here, it is not disputed that Plaintiff has a sincere religious belief, that he notified Defendant that his belief conflicted with the requirement that he take a photo, and that he was terminated for not complying with the same.  However, Defendant asserts that Plaintiff has not "demonstrated that a religiously motivated practice conflicts with an employment requirement."[95] Defendant argues that the requirement of a photo ID is not mandated by Defendant, but rather is a requirement of the Regulations and federal law.[96]  Thus, it is not an employment requirement and Plaintiff cannot demonstrate a *prima facie* case of religious discrimination.

The Court notes that the Third Circuit has not yet adopted the definition of "employment requirement" advanced by Defendant, a definition defined so narrowly as to only encompass those

---

[94] Shelton, 223 F.3d at 224 (citation omitted).

[95] United States v. Board of Educ., 911 F.2d 882, 886 (3d Cir. 1990).

[96] Def.'s Reply at 13.

13

requirements that are employer mandated.[97]  Moreover, the cases cited by Defendant in support of

its contention are all in the context of an employee refusing to provide an employer with a social

security number.[98]  None of these cases contains language even implying that its holding should be

extended beyond the narrow factual basis for the same.  Moreover, the analysis in each of the cases

did not stop when it was determined the employee had not established a *prima facie* case of religious

discrimination.  Instead, the courts examined whether the employer could have waived the

requirement or accommodated the employee's religious beliefs without undue hardship.[99]  Hence,

the Court finds no basis to accept Defendant's suggestion to extend the rationale underlying the cited

cases.

　　　Title VII "requires employers to make reasonable accommodations for their employees'

religious beliefs and practices, unless doing so would result in 'undue hardship' to the employer."[100]

To accept Defendant's argument would establish a *per se* rule that if a requirement is mandated by

law, then an employer need not even attempt to accommodate an employee's religious beliefs, even

if it were feasible to do so without undue hardship.  Thus, the Court finds it is necessary for the

---

[97] While Defendant's entire argument turns on the definition of "employment requirement," the Third Circuit recently enunciated the first prong of the *prima facie* case of religious discrimination as "a sincere religious belief that conflicts with a *job* requirement."  Webb v. City of Philadelphia, 562 F.3d 256, 259 (3d Cir. 2009) (emphasis added).  Defendant's argument that "employment requirement" is a term of art that has a particular connotation of an employer mandated requirement is greatly undercut by the Third Circuit's willingness to substitute a synonym for "employment."  This seems to imply that "employment requirement" has no special meaning and actually refers to all requirements of one's employment or job, whether mandated by an employer or by law.

[98] See Seaworth v. Pearson, 203 F.3d 1056, 1056-1057 (8th Cir. 2000); see also Baltgalvis v. Newport News Shipbuilding, Inc., 132 F. Supp. 2d 414, 418 (E.D. Va. 2001); Yisrael v. Per Scholas, Inc., No. 01-1600, 2004 WL 744485, at *3 (S.D.N.Y. April 7, 2004); EEOC v. Allendale Nursing Ctr., 996 F. Supp. 712, 717 (W.D. Mich. 1998).

[99] Seaworth, 203 F.3d at 1057-58; see also Baltgalvis, 132 F. Supp. 2d at 419-20; Yisrael, 2004 WL 744485 at *3-*4; Allendale, 996 F. Supp. at 718.

[100] Shelton, 223 F.3d at 224 (citing 42 U.S.C. §§ 2000e2(a)(1), 2000e(j) (1982)).

analysis in such matters to continue beyond the *prima facie* level to determine whether Plaintiff's

religious beliefs could have been accommodated, regardless of whether the requirement is mandated

by an employer or by law.  As an employment requirement need not be employer mandated, Plaintiff

has established a *prima facie* case of religious discrimination.

> B.    *Eliminating the photo identification requirement for Plaintiff would impose an undue hardship on Defendant*

Once a *prima facie* case is established, "the burden shifts to the employer to show that it

made good faith efforts to accommodate, or that the requested accommodation would work an undue

hardship."[101]  Here, Defendant does not contend that it offered Plaintiff any sort of accommodation.

Thus, this matter will "turn[] on the question of whether the employer can demonstrate that it could

not accommodate a religious practice without 'undue hardship.'"[102] Undue hardship is requiring the

employer "to bear more than a *de minimis* cost" in order to accommodate the employee's religious

practice.[103]   Economic, as well as non-economic costs can impose an undue hardship on

employers.[104]   The Supreme Court has strongly suggested that "the undue hardship test is not a

difficult threshold to pass."[105]

A case factually similar to the one at hand is <u>United States v. Board of Education</u>.[106]  In that

case, the plaintiff was a devout Muslim woman who worked as a substitute teacher in the

---

[101] <u>Id.</u> (citing <u>Board of Educ.</u>, 911 F.2d at 886-87; <u>Getz v. Pennsylvania</u>, 802 F.2d 72, 73 (3d Cir. 1986)).

[102]  <u>Board of Educ.</u>, 911 F.2d at 886.

[103] <u>Trans World Airlines v. Hardison</u>, 432 U.S. 63, 84 (1977).

[104] <u>Webb</u>, 562 F.3d at 260.

[105] <u>Id.</u> (citing <u>Board of Educ.</u>, 911 F.2d at 890); <u>see also</u> <u>Hardison</u>, 432 U.S. at 84.

[106] 911 F.2d at 882.

Philadelphia School District.[107]  The plaintiff sought to wear a head scarf in conformance with her

religious beliefs while teaching.[108]  Principals of various schools informed her that pursuant to state

law, the plaintiff could not teach in religious garb and refused to allow her to teach without changing

her clothing.[109]  The Third Circuit found that the Board of Education for the School District of

Philadelphia could not accommodate the plaintiff without undue hardship because of the law that

prohibits her from teaching in religious garb.[110]  The Third Circuit held "it would be an undue

hardship to require [an employer] to violate an apparently valid criminal statute, thereby exposing

its administrators to criminal prosecution and the possible consequences thereof."[111]

The Court applies the reasoning in Board of Education to the action at hand.  As explained

supra, the Regulations require that Plaintiff, as a port facility employee, carry a photo ID.  The Coast

Guard will not waive this requirement, and therefore, Defendant may not do so without violating the

Regulations.  Many of the accommodations requested by Plaintiff both prior to and after his

termination sought to circumvent the photo ID requirement, including (1) having a supervisor verify

his identity; (2) showing his non-photo driver's license in conjunction with a non-photo employee

---

[107] Id. at 884.

[108] Id.

[109] Id. at 885.

[110] Id. at 887.

[111] Id. at 891.

ID; (3) being escorted to his work location;[112] and (4) using biometric identification.[113]  The aim of these accommodations is to obviate the need for Plaintiff to pose for and carry a photo ID. Defendant could not accept any of these suggested accommodations without violating the Regulations.

Nevertheless, Plaintiff contends that Defendant has failed to demonstrate undue hardship as it has not presented any evidence that it would face penalties under the MTSA or the Regulations, nor any evidence of a burden on the conduct of its business if it did accommodate Plaintiff.[114]  In this argument, however, Plaintiff misconstrues the law.  Defendant need not show that the MTSA or the Regulations would be enforced against it, only that "there was no assurance that [the Coast Guard] would not enforce" the same.[115]  In fact, Defendant has adduced much evidence that the Coast Guard has every intention of enforcing the MTSA and the Regulations, and that Philadelphia refinery is subject to constant audits and inspections.[116]  To accommodate Plaintiff, Defendant risks conditions on or the suspension of its facility's operations, or even the shutdown of its Philadelphia refinery.[117] Defendant contends that these penalties would inflict an undue hardship on the conduct of its

_____

[112] There is no dispute in the Record that even those being escorted were still required to show photo ID. (Arb. Tr. at 20:8-20.)  Hence, this requested accommodation would not circumvent the photo ID requirement, and is unreasonable for this reason as well.

[113] The Court notes that the Regulations now require port facility employees to obtain a Transportation Worker Identification Credential ("TWIC"), which requires both a photograph and a biometric identifier.  See 33 C.F.R. § 101.515 (2007); see also Def.'s Reply Ex. K.

[114] Pl.'s Resp. at 6.

[115] Board of Educ., 911 F.2d at 890.

[116] Arb. Tr. at 25:1-17, 26:3-14, Def's Reply Exs. D, L.

[117] Def.'s Reply Ex. C at 327 (33 C.F.R. § 101.410(c)(1)-(5)).

business, and the Court agrees.[118]  This is not a situation where "the chances of enforcement are negligible and accommodation involves no realistic hardship."[119]  As a matter of law, allowing Plaintiff to work at Defendant's Philadelphia refinery without photo ID cannot be accomplished without undue hardship to Defendant.[120]

      C.    *The accommodations suggested by Plaintiff are either unreasonable or would impose an undue hardship on Defendant*

In addition to suggesting accommodations that would circumvent the photo ID requirement, Plaintiff argues that Defendant should have accommodated him by (1) providing him with an opportunity to request an accommodation or waiver from the Coast Guard, (2) capturing his image using a security or surveillance camera or (3) offering him employment at a non-port facility.[121]  Prior to Plaintiff's termination, Defendant did inquire if there was any possibility of waiving the requirement of a photo ID as to Plaintiff.[122]  There was not.[123]  After Plaintiff's termination, the PHRC also made an inquiry along the same lines, inquiring if there was any allowance for an accommodation.[124]  The answer was unchanged.[125]  Plaintiff has not produced any evidence that the answer would have been any different had he asked.  Nor did he avail himself of the appeal process

---

[118] See Board of Educ., 911 F.2d at 891.

[119] Id.

[120] Id. at 887.

[121] Pl.'s Resp. at 6.

[122] Arb. Tr. 23:17-24:12; Def.'s Reply Ex. J.

[123] Id.

[124] Def.'s Reply Ex. J.

[125] Def.'s Reply Ex. K.

provided for by the Regulations by which any person directly affected by a decision or action taken under the Regulations could appeal the same.[126]  Thus, Plaintiff has not demonstrated a genuine issue of material fact as to whether or not providing him with an opportunity to request an accommodation or waiver from the Coast Guard would have been futile.  This accommodation is not a reasonable one and Defendant need not have provided it to Plaintiff.

Next, Plaintiff claims that because his religion does not prohibit a photo being taken of him without his consent,[127] Defendant could have provided him with a photo ID by capturing his image using a security or surveillance camera.  In response, Defendant has submitted a declaration from Frank Recknagel, the Planning and Compliance Supervisor of Defendant's NER Plant Protection Department, stating that the security system at the Philadelphia refinery "does not have the capability to capture the current facial appearance of plaintiff or any other individual in a still photograph with sufficient resolution for use on a photo ID."[128]  Plaintiff has produced no evidence to the contrary. Thus, there is no genuine issue of material fact as to whether an adequate photo of Plaintiff could be captured by Defendant's current security.  Thus, this suggested accommodation is also unreasonable and Defendant was not obliged to provide it to Plaintiff.

Finally, Plaintiff asserts that he should have been offered employment at a non-port facility.[129]

---

[126] Def.'s Reply Ex. C at 327 (33 C.F.R. § 101.420).

[127] Cherry Dep. at 101:7-102:12.

[128] Def.'s Reply Ex. O ¶¶ 1, 3.

[129] The first time Plaintiff suggested this accommodation was in his response to Defendant's motion for summary judgment.  (Pl.'s Resp. at 6.)  Plaintiff did not request this accommodation either before he was terminated or during the arbitration of his grievance.  (See Pl.'s Resp. Ex. B.)  Thus, Plaintiff never actually requested this accommodation from Defendant, but only advanced it as a grounds upon which the Court should find discrimination. See Shelton, 223 F.3d at 224 ("If the employee establishes a prima facie case, the burden shifts to the employer to show that it made good faith efforts to accommodate, or that the *requested* accommodation would work an undue hardship" (emphasis added)).  There is no evidence in the Record that beyond the argument of counsel, Plaintiff is

Defendant adduced a declaration from Donna Birosak, the Human Resources Manager for Defendant's Refining and Supply Division.[130]  Ms. Birosak states in her declaration that all three refining facilities operated by Defendant in the Philadelphia area are port facilities subject to the requirement that Plaintiff have and carry a photo ID.[131]  Moreover, Ms. Birosak states that Defendant operates only two refining facilities that are not also port facilities, one in Tulsa, Oklahoma and the other in Toledo, Ohio.[132]  According to Ms. Birosak, these facilities have in place seniority systems that would not allow Defendant to transfer Plaintiff to either facility without violating the same.[133]  Again, Plaintiff provides no evidence to the contrary.  Absent discriminatory intent,[134] an employer is not "required by Title VII to carve out a special exception to its seniority system in order to help [an employee] meet his religious obligations."[135]  As offering Plaintiff employment at a non-port facility would impose an undue hardship on Defendant,[136] Defendant was not obliged to provide this

---

actually requested this accommodation, which may necessitate his moving to Oklahoma or Ohio.  Thus, the Court cannot find that Plaintiff has shown a genuine issue of material fact, even if this accommodation was reasonable and did not impose an undue burden on Defendant.

[130] Def.'s Reply Ex. P.

[131] Id. ¶ 2.

[132] Id. ¶ 3.

[133] Id.

[134] Hardison, 432 U.S. at 82 (noting the finding by the district court that the "seniority system was not designed with the intention to discriminate against religion").  Here, Plaintiff has produced no evidence of discriminatory intent, and thus similar to Hardison, it is only a coincidence that the seniority systems in place at the Tulsa and Toledo facilities prevented Defendant from accommodating Plaintiff.  Id.  Hence, Plaintiff has again failed to produce evidence that would create a genuine issue of fact in this matter.

[135] Hardison, 432 U.S. at 82-3; see also Webb, 562 F.3d at 260 (Defining the non-economic costs that pose an undue hardship upon employers as including "violations of the seniority provision of a collective bargaining agreement"); Board of Educ., 911 F.2d at 887 ("Hardison did, however, recognize an arguably non-economic burden when it held that the employer could not be required to violate the seniority provisions of a collective bargaining agreement . . . .").

[136] See Board of Educ., 911 F.2d at 891.

accommodation to Plaintiff.

There is no genuine issue of fact regarding whether Defendant was obliged to provide Plaintiff with any of his suggested accommodations.  As all of them were either unreasonable or would have imposed an undue hardship on Defendant, Defendant is entitled to judgment as a matter of law on Plaintiff's Title VII claims.[137]

## V.    CONCLUSION

As a port facilities employee, Plaintiff was required under the MTSA and the Regulations to have and carry photo ID.  Defendant could not waive this requirement nor could it make any accommodation that would eliminate the same without suffering undue hardship.  The accommodations suggested by Plaintiff were either unreasonable or would also impose an undue hardship on Defendant.  Because Plaintiff's religious beliefs could not be accommodated without imposing an undue burden on Defendant, Plaintiff's Title VII claim must fail.

An appropriate Order follows.

---

[137] The Court notes that the same legal standard for claims of discrimination under federal anti-discrimination laws should be applied to Plaintiff's claims under the PHRA.  *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d. Cir. 1996).  Hence, the Court's analysis of Plaintiff's claims under Title VII applies equally to his claims under the PHRA.  The Court will not conduct a separate inquiry.  As Plaintiff's claims under Title VII fail, so too do his claims under the PHRA.